**STANDARD DYEING AND FINISHING CO. and Standard Textile Bonding Co., Plaintiffs,**

v.

**ARMA TEXTILE PRINTERS CORP. and Hudson Valley Dyeing and Finishing Co., Inc., Defendants.**

No. 85 Civ. 5399 (BN).

United States District Court, S.D. New York.

Jan. 25, 1991.

Ridley M. Whitaker (John P. Markos, of counsel), New York City, for plaintiffs.

Cordero Glasgow & Barness, Gelacio M. Cordero, New York City, for defendant Arma Textile Printers Corp.

Kleinman & Saltzman, P.C., Lester A. Levin, West Nyack, N.Y., for defendant Hudson Valley Dyeing and Finishing Co., Inc.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court Judge by designation:

### INTRODUCTION

Standard Dyeing and Finishing Co. and Standard Textile Bonding Co. (collectively

"Standard") are New Jersey corporations that until July 1980 were engaged in the business of dyeing and finishing fabrics in Paterson, New Jersey. Hudson Valley Dyeing and Finishing Co., Inc. ("Hudson"), a New York corporation, was formerly engaged in the printing and dyeing of fabrics in Newburgh, New York from December 30, 1982 until April 24, 1984. Arma Textile Printers Corp. ("Arma") is a New York corporation which on April 24, 1984 commenced a printing and dyeing business in the Newburgh, New York premises ("Newburgh premises") formerly occupied by Hudson. Certain machinery and equipment located at the Newburgh premises, which was originally owned by Standard ("Standard Equipment" or "Equipment"), is the subject of the dispute between the parties.

Standard's amended complaint sets forth eight causes of action revolving around an alleged fraudulent transfer of Hudson's assets to Arma, wrongful possession and use by Arma of the Standard Equipment and tortious interference by Arma with Hudson's contractual obligations to Standard under a Settlement Agreement arising out of a prior lawsuit between Standard and Hudson. Standard seeks recovery of compensatory and punitive damages, attorney's fees, a permanent injunction enjoining transfer of defendants' assets and other relief discussed *infra*. Standard does not seek repossession of the Equipment.

Arma's answer to the amended complaint interposes a counterclaim seeking recovery of "storage charges" alleging that the Standard Equipment left on the Newburgh premises trespasses upon and wrongfully interferes with Arma's leasehold of the premises. Standard disputes liability for the storage charges.

The court's jurisdiction in this diversity action is predicated on 28 U.S.C. § 1332.

An eleven day bench trial generated a transcript of testimony in excess of one thousand six hundred pages and hundreds of pages of documentary exhibits. The court has carefully considered the record and post-trial submissions by counsel (last post-trial reply brief was filed on December 17, 1990), and based on the following findings of fact and conclusions of law set forth in compliance with Rule 52, Fed.R. Civ.P. dismisses both the complaint and counterclaim.

## FINDINGS OF FACT

Until July 1980, Standard conducted a dyeing and finishing business in Paterson, New Jersey. In July 1980 Adolph Nazzaro, Sr. ("Nazzaro"), Standard's president and its chief executive officer, decided to cease operation of the Paterson plant and form a new corporation, New–Stan Dyeing and Finishing Co. ("New–Stan"), to resume Standard's dyeing and finishing operations in Newburgh. Nazzaro became New–Stan's Chairman of the Board and was active in the day-to-day operations of new company.

On August 6, 1980 New–Stan acquired title to the Newburgh premises at 41 Wisner Avenue and the machinery on the premises ("Newburgh machinery" or "machinery") from Newburgh Dyeing and Finishing Corp. ("Newburgh Corp."), whose shares were owned solely by Frederick Massimi, Sr. ("Massimi"). To finance the acquisition of the Newburgh premises and machinery, New–Stan granted Newburgh Corp. a mortgage on the real estate and a security interest in the machinery.

Pursuant to security agreements dated March 12, 1981, Standard "consigned" the Standard Equipment, formerly used at the Paterson plant, to New–Stan with an option to purchase and reserved a security interest. New–Stan used but never purchased the Standard Equipment.

In 1982, New–Stan experienced financial difficulties, defaulted on its obligations to Newburgh Corp. and terminated its dyeing and finishing operations. On December 30, 1982 New–Stan relinquished the Newburgh premises to Newburgh Corp. by deed in lieu of foreclosure, and at the same time, Newburgh Corp. peacefully repossessed the Newburgh machinery. However, New–Stan did not return the unpurchased Standard Equipment to Standard, and the Equipment was not repossessed by Stan-

dard from New–Stan nor otherwise disposed of by either New–Stan or Standard.

Contemporaneously with the New–Stan/Newburgh Corp. deed in lieu of foreclosure on December 30, 1982, Newburgh Corp. sold to Hudson the Newburgh premises and Newburgh machinery repossessed from New–Stan. Hudson financed the purchase of the business by two mortgages to Newburgh Corp., a security agreement covering the Newburgh machinery and the assumption of certain existing debts of Newburgh Corp. Hudson assumed possession of the Standard Equipment left on the Newburgh premises by New–Stan. Some of this Equipment had been installed inside the plant by Standard and New–Stan, and some pieces were stored in the yard.

The shareholders of Hudson were Frederick Arbusto, Sr. (22½%), Frederick Arbusto, Jr. (22½%), and Massimi's two sons, Frederick, Jr. and Gregory, who owned the majority interest (27½% each). Arbusto, Sr., who was thoroughly experienced in the textile printing and dyeing business, was named as Hudson's president and was its chief operating officer. Massimi, the sole owner of Newburgh Corp., acquired no shares in Hudson, and was neither a director nor an officer of Hudson. However, because Massimi's two sons were shareholders of Hudson, and Massimi and his wife had financially backed Hudson and were substantial creditors of the firm, Massimi maintained a general oversight of the operations of Hudson. Thus, Massimi attended organizational meetings in the formation of Hudson, provided on-going consultation and, as Massimi had done previously when New–Stan occupied the premises, occupied an office on the premises in connection with an unrelated business. However, responsibility for the day-to-day operations of Hudson devolved primarily on Arbusto, Sr. by reason of his experience and expertise in the textile finishing business. Neither Massimi nor Newburgh Corp. managed or controlled Hudson's day-to-day business operations.

On December 30, 1982, when Hudson acquired the Newburgh premises, Standard still owned but had failed to repossess or otherwise dispose of the Standard Equipment, which New–Stan never purchased from Standard and simply left on the Newburgh premises. Nazzaro requested of Hudson that the latter either return or purchase the Standard Equipment within thirty days (plft's exh. 35). Periodically thereafter in 1983 and until April 1984, Standard communicated with Hudson or its attorney requesting that Hudson either purchase or lease the Equipment from Standard, or permit Standard to remove the Equipment from Hudson's premises. No agreement was ever reached between Standard and Hudson for the purchase, lease or peaceful repossession of the Standard Equipment.

On April 26, 1984, asserting ownership of the Standard Equipment (as listed in plft's exh. 17 & 18; *see* plft's exh. 122, Tr. 359–394, 395–464, 535), Standard instituted an action against Hudson in the United States District Court for the Southern District of New York alleging, *inter alia,* conversion and unlawful detainer of Standard's Equipment in the possession of Hudson and seeking damages equivalent to the value of the equipment (*Standard Dyeing and Finishing Co. v. Hudson Valley Dyeing and Finishing Co.,* 84 Civ. 2928, 1984 WL 846 (Judge Charles S. Haight, Jr.)) ("the 1984 action").

On October 22, 1984 Standard, Hudson and the other parties to the 1984 action entered into a stipulation for an order of discontinuance and a Settlement Agreement. Under the Settlement Agreement (plft's exh. 68 and exhibit 2 attached to the complaint) Hudson was stipulated to be the *present* owner of the Standard Equipment, which was to remain in the possession of Hudson on the Newburgh premises; Hudson agreed to pay Standard a total sum of $85,300, with an initial cash payment of $5,000 and the balance to be paid in installments with interest; and Hudson agreed to use its best efforts to find a buyer for the equipment, and deliver all proceeds of sale to Standard. The Settlement Agreement further provided that in the event of default by Hudson, Standard at its option could accelerate the full amount due under the Agreement and Hudson agreed it

would consent to a judgment for the outstanding balance, plus interest. Further, under the Settlement Agreement, Hudson agreed to contemporaneously execute a Security Agreement covering the Standard Equipment. Under the Security Agreement, except for the creditor's (Standard's) security interest, the collateral (Standard Equipment) was warranted and agreed to be "lawfully owned by the Debtor" (Hudson).

Under the Security Agreement, Standard had the right to repossess the Equipment and foreclose on its security interest in accordance with the Uniform Commercial Code ("U.C.C.").

Massimi and Newburgh Corp., who were not parties to the 1984 action, *consented* to the terms of the Settlement Agreement and "agree[d] to cooperate with the parties in, and to execute and deliver all instruments required for carrying out the terms of the agreement herein." Neither Massimi nor Newburgh Corp. agreed to guarantee or perform Hudson's obligations under the Settlement Agreement.

In accordance with the stipulation of dismissal in the Settlement Agreement, Judge Haight entered an order of discontinuance of the 1984 action.

As was the experience of New–Stan, who in 1982 defaulted on its obligations to Standard and Newburgh Corp. and terminated its business operations, in 1985 Hudson also encountered serious financial and operating difficulties, defaulted on its obligations to Standard and Newburgh Corp. and terminated its business. After making several payments to Standard under the Settlement Agreement aggregating approximately $14,000, in January 1985 Hudson defaulted on the balance due thereunder. It appears that the Arbustos terminated Hudson's business, resigned as officers of Hudson, and closed down the plant leaving its records and affairs in disarray. At that point in time, Massimi was in semi-retirement in Florida, and was advised of the situation by his son Gregory.

In addition to its default under the Settlement Agreement with Standard in early 1985, Hudson defaulted on its mortgages to Newburgh Corp. and on several other obligations of Newburgh Corp. that Hudson had agreed to assume in order to obtain financial backing from Massimi. As noted above, upon learning of the termination of Hudson's business and loan defaults, Massimi returned to Newburgh from Florida. Stated succinctly, Massimi found conditions at the Newburgh plant in shambles, including no heat or electricity.

Following virtually the same scenario of New–Stan's 1982 loan defaults on its obligations to Standard and Newburgh Corp., business termination and peaceful surrender of the Newburgh premises and machinery to Newburgh Corp., in April 1985 Hudson defaulted on its debts to Standard and Newburgh Corp., terminated its business and peacefully relinquished the Newburgh premises and machinery to Newburgh Corp. A deed in lieu of foreclosure was executed and delivered by Massimi, Jr. and Gregory Massimi to Newburgh Corp. on April 24, 1985, after the resignation of the Arbustos. Again, parallel to New–Stan's course of action after defaults on debts to Standard and Newburgh Corp. in 1982, Hudson simply left the Standard Equipment on the Newburgh premises when Hudson vacated in 1985, without any agreement or arrangement between Hudson and Standard for repossession or between Hudson and Newburgh Corp. for the subsequent removal or other disposition of the Equipment. *There is no evidence of any purported "transfer" or "conveyance" of the Standard Equipment by Hudson to Newburgh Corp.*

Contemporaneously with Newburgh Corp.'s peaceful repossession of the Newburgh premises and machinery from the defunct Hudson on April 24, 1985, Newburgh Corp. leased the premises and sold the Newburgh machinery to Arma, whose shares were also solely owned by Massimi (Joint Pretrial Order, Stip. facts, par. 5 and 6). Although the Standard Equipment remained on the Newburgh premises after Hudson's deed in lieu of foreclosure to Newburgh Corp. and the latter's lease to Arma, *there was no "transfer" or "conveyance" of the Standard Equipment*

*from Newburgh Corp. to Arma.* On and after April 24, 1985 Arma continued essentially the same dyeing and finishing operations on the Newburgh premises that previously had been conducted by Hudson and continued to service Hudson's customers. Arma used the Standard Equipment left in the plant by Hudson while other Equipment, characterized by Massimi as "junk," was stored outside in the yard.

After Hudson's default under the Settlement Agreement and termination of its business, Standard, who had a security interest in the Equipment pursuant to a Security Agreement with Hudson, took no steps through peaceful or judicial process to repossess the Equipment or otherwise foreclose on its security interest. Even after learning in July 1985 that the Newburgh premises were leased to Arma, and that the latter was then using some of the Standard Equipment, Standard made no attempt to repossess it or otherwise pursue its security interest.

On several occassions shortly after Newburgh Corp. had leased the Newburgh premises to Arma, Massimi (who was the sole owner of both firms) had street conversations with Nazzaro and requested removal of his "junk" from the premises, referring particularly to the discarded Standard Equipment stored in the yard. Standard declined to remove any of the Equipment from the Newburgh premises. Meanwhile, Massimi was billing Standard for storage charges for the period of January 1, 1983 to April 1, 1985, *the period during which Hudson had occupied the Newburgh premises.* These storage invoices stated that they were to be paid to *Newburgh Corp.,* notwithstanding that contemporaneously with Hudson's deed in lieu of foreclosure to Newburgh Corp., the latter leased the premises to Arma. Based on $5,000 per month, the storage charges amounted to $140,000 in April 1985, $155,000 in July 1985, and $165,000 in September 1985 (*see* plft's exhs. 96, 111, deft's exh. N).

Although Nazzaro admittedly felt intimidated by the substantial storage bills, Standard declined to pay them. But Standard also failed to take any action to foreclose on Standard's security interest through judicial process and challenge the propriety of the storage charges. Rather, on July 16, 1985 Standard commenced the instant action against Hudson and Arma, which does not seek repossession or foreclosure of Standard's security interest.

Standard alleges causes of action for: Arma's liability under the Settlement Agreement as an alter ego of Hudson and/or Newburgh Corp.; Arma's liability for tortious interference with the contractual relations between Standard and Hudson under the Settlement Agreement; Hudson's fraudulent conveyance of its assets to Arma; and Arma's conversion of the Standard Equipment. Moreover, Newburgh Corp. and Massimi, who are alleged by Standard to have played a pivotal role in the alleged misdeeds of Hudson and Arma, are not parties in the current suit.

After commencement of the current suit on July 16, 1985, Standard moved before Judge Haight in the 1984 action, by order to show cause signed August 1, 1985, to enter final judgment against Hudson, in conformance with the terms of the Settlement Agreement. Standard's motion was granted by Judge Haight on December 3, 1985, and on December 26, 1985 Judge Haight entered a final money judgment against Hudson in the 1984 action.

## CONCLUSIONS OF LAW AND DISCUSSION

*Standard's pretrial motion for attachment*

Standard's claims relating to fraudulent conveyance under the New York Debtor and Creditor Law § 276–a and alter ego were considered by Judge Haight in connection with Standard's 1986 pretrial motion in the current case for an attachment against Hudson and Arma pursuant to New York's CPLR § 6201 *et seq.* In a memorandum opinion and order of July 31, 1986, the motion was denied (predicated, of course, on the record before the court prior to the trial on the merits in 1990).

In support of its 1986 motion for attachment, Standard asserted that the transaction in which Arma had acquired Hudson's assets was a fraudulent transfer and intended to frustrate the Settlement Agreement. Further, Standard claimed that Arma was simply Hudson's alter ego.

Judge Haight, in his 1986 memorandum opinion and order denying Standard's motion, found that Hudson had defaulted on its obligations to Newburgh Corp., that the latter foreclosed on its mortgages and security interests in the Newburgh premises and machinery, and that Newburgh Corp. then leased the premises and sold the machinery to Arma. The court's opinion notes, too, that the December 30, 1982 promissory notes upon which Hudson had defaulted and Newburgh Corp. repossessed Hudson's property, were executed well before Standard's original lawsuit against Hudson, and there was no evidence that the notes were executed for other than legitimate business purposes. Accordingly, Judge Haight determined that Standard failed to establish either its fraudulent transfer or alter ego theories. Further, the court found no evidence that Newburgh Corp.'s decision to repossess upon Hudson's default was designed to frustrate the Settlement Agreement.

In considering Standard's arguments for an attachment, Judge Haight recognized the facts that Massimi owned and operated both Newburgh Corp. and Arma; that Arma employed many of the same individuals formerly employed by Hudson; that Massimi had a desk at the Newburgh premises while occupied by Hudson; that Massimi's two sons owned a controlling share of Hudson; and that the plant and equipment acquired by Arma (including the Standard Equipment) were formerly owned and operated by Hudson. Notwithstanding the foregoing facts, the court concluded that there was no evidence to establish that Massimi's decision to create Arma to operate the repossessed plant was designed to frustrate the Settlement Agreement. As observed by Judge Haight, "[f]rom all that appears in the record, the two-step transfer of assets from Hudson [through Newburgh Corp.] to Arma was the result of legitimate business decisions." Memorandum decision, at 5.

Continuing, Judge Haight observed:

These facts are not sufficient evidence that the facially legitimate transfer of assets from Hudson to Newburgh to Arma was fraudulent. They are also insufficient reasons to believe that Arma is merely Hudson's "alter ego." Even when a single individual owns and controls two corporations, the corporate form will not be disregarded unless it is shown that the corporate forms are being used for dishonest purposes. * * * The fact that Arma now occupies Hudson's old plant is a natural result of the facially innocent transfer of assets in April 1985. At least on this record, plaintiffs have made no showing of the kind of disregard and misuse of the corporate form that would justify treating these corporations as "alter egos." * * *

Because neither the April, 1985 transfer of assets nor the relationship between the defendant corporations have sufficiently been shown fraudulent, or designed to frustrate Hudson's creditors, plaintiffs' motion for an order of attachment is denied [footnote omitted].

*Viability of Standard's claims after trial on the merits*

—Generally

The question now presented for determination is whether the evidence adduced at the trial warrants any departure from the pretrial factual and legal determinations of Judge Haight in his memorandum opinion of July 31, 1986. Fundamentally, notwithstanding the adverse decision of Judge Haight on Standard's pretrial attachment motion, Standard was entitled to an opportunity to present its evidence in a trial on the merits to establish its claims. But in short, this court finds no credible new evidence adduced at the trial on the merits that warrants any change in the determinations previously reached by Judge Haight. Further, Standard has failed to establish its

additional claim of conversion. A discussion of Standard's claims follows.

—Standard's fraudulent transfer theory

■ As urged in its pretrial motion for an attachment, Standard insists here that at the time Hudson became insolvent and terminated its business, there was a fraudulent transfer of its assets to Arma in violation of the New York Debtor and Creditor Law, § 276–a. Standard requests that the alleged fraudulent transfer to Arma be declared null and void, set aside, the property restored to Hudson for sale on execution, and the proceeds of sale applied to satisfy any judgment rendered against Hudson herein.

Not only has there been a complete failure by Standard to show fraudulent intent, bad faith or inadequate consideration involved in Hudson's peaceful surrender of the Newburgh premises and machinery to Newburgh Corp. after Hudson became insolvent and defaulted on its obligations to Standard and Newburgh Corp., the court finds no evidence of a formal transfer or conveyance of title or any interest in the *Standard Equipment* to Arma. There is no contract or other document in the record purporting to transfer any title or interest in the Standard Equipment to Newburgh or to Arma. Indeed, Standard admits in its post-trial brief (p. 11) to the complete absence of any documentation or corporate records that would substantiate the alleged transfer to Arma of the Standard Equipment by Hudson or Newburgh Corp.

The simple fact remains that after Hudson defaulted on its obligations to Standard and Newburgh Corp. and relinquished the Newburgh premises, Hudson made no arrangement for the removal of the Standard Equipment or its peaceful repossession by Standard, but simply abandoned the Equipment on the premises, and Arma then used the Standard Equipment left in the plant.

In sum, the circumstances under which there was a peaceful repossession of the Newburgh premises and Newburgh machinery from Hudson by Newburgh Corp. and a transfer of those assets to Arma in March 1985 (Arma purchased only the Newburgh machinery; Arma leased the premises) are essentially parallel to the circumstances where in 1982, Newburgh Corp. peacefully repossessed those premises and machinery from New–Stan and transferred them to Hudson. At the time of the peaceful repossessions by Newburgh Corp., both New–Stan and Hudson were defunct and in default on their mortgages to Newburgh Corp., and there was nothing sinister or surreptitious concerning the peaceful surrenders. In essence, Hudson assumed the operations of New–Stan, and similarly after Hudson terminated its business, Arma assumed and continued the dyeing and finishing operations of Hudson at the premises, using the Standard Equipment left on the premises by the former occupants. Standard's claim that Hudson fraudulently transferred its assets to Arma is patently untenable under the circumstances of this case and is rejected.

—Standard's alter ego theory

■ Standard argues that Arma was a "continuance" or alter ego of Hudson, and hence liable for Standard's attorney's fees under the Settlement Agreement. The alter ego theory advanced by Standard is predicated on allegations that both corporations were under the common management, domination and control of Massimi; that Hudson owned no assets of its own or kept books and records separate from those of Arma; that Arma financed Hudson and was involved in the operation of Hudson's business; and that the two corporations commingled their bank accounts and funds.

The plain facts are that Arma leased the Newburgh premises and commenced operations *only after* Hudson had failed in the business, defaulted on its mortgages and other debts and terminated operations, Hudson's assets were repossessed by Newburgh Corp., and for business reasons Massimi wished to continue business operations through Arma. There is no evidence that Arma and Hudson, either concurrently or successively, were controlled, managed or operated by the same persons or acted on behalf of each other in the conduct of their respective businesses. Moreover, Arma unlike Hudson, was not a party to the 1984 action or to the Settlement Agreement; nor

did Arma assume any of Hudson's liabilities when it leased the Newburgh premises.

Massimi, while a substantial creditor of and consultant to Hudson, did not own shares in, manage or control Hudson. Arbusto, Sr., who was Hudson's President and its chief operating officer, and was a substantial shareholder in Hudson, owned no shares in Arma and was not a director or officer of Arma. Notwithstanding that Massimi was a substantial creditor of Hudson and provided consultation to the firm, there is no evidence that Arbusto, Sr. or Massimi's two sons were controlled or directed by, or reported to, Massimi on the day-to-day operations of Hudson. Finally, there is no evidence whatever that Hudson and Arma did not keep separate books and records or commingled their funds.

■ The court now turns to Standard's theory that Arma was the alter ego of Newburgh Corp., who consented to the 1984 Settlement Agreement. Anomalously, while Standard has not joined Newburgh Corp. as a party defendant in this action, Standard nonetheless insists that Newburgh Corp. consented to the Settlement Agreement, and that Arma as Newburgh Corp.'s alter ego incurred liability for all attorney's fees incurred by Standard. But Standard has failed to establish either that Arma was an alter ego of Newburgh Corp., or even that Newburgh Corp. itself incurred any liability for Standard's attorney's fees by virtue of consenting to the Settlement Agreement.

Although there is no dispute that both Newburgh Corp. and Arma were wholly owned and managed by Massimi, there is no evidence that each corporation acted on behalf of the other, were engaged concurrently or successively in the textile dyeing and finishing business, or were operated as a single enterprise.

In any event, Arma incurred no liability for any of Hudson's obligations under the Settlement Agreement by reason of Newburgh Corp.'s consent to the Agreement. Plainly, this court lacks jurisdiction over Newburgh Corp., who is not before the court in this action, to adjudicate its liability under the Settlement Agreement. However, the court notes that in consenting to the Settlement Agreement, Massimi and Newburgh Corp. agreed only to "cooperate with the parties" and "to execute and deliver all instruments required for carrying out the terms of the agreement." There is not the slightest suggestion in the Agreement that either Massimi or Newburgh Corp., by their consent, undertook to guaranty or perform Hudson's obligations or pay Standard's attorney's fees. Clearly, then, Arma cannot be adjudged liable under the Settlement Agreement on the predicate that Newburgh Corp. consented to be liable for Standard's attorney's fees and that Arma was Newburgh Corp.'s alter ego.

In short, Arma, Newburgh Corp. and Hudson were separate corporate entities and they were operated as such. This court agrees with Judge Haight's observation in his memorandum opinion and order on Standard's attachment motion that "[e]ven where a single individual owns or controls two corporations, the corporate form will not be disregarded unless it is shown that the corporate forms are being used for dishonest purposes." Nothing in the trial record of this case warrants the finding that Arma and Newburgh Corp. were used by Massimi for dishonest purposes, or that warrants a change from Judge Haight's pretrial factual determination that "Standard has made no showing of the kind of disregard and misuse of the corporate form to justify treating [Arma and Hudson] as 'alter egos'."

—Arma's alleged tortious interference with the Standard/Hudson Settlement Agreement

■ Standard contends that Arma is liable for the tortious interference with the contractual relations between Standard and Hudson. Specifically, Standard alleges that Arma and Hudson fraudulently conspired to discontinue the business of Hudson, effectuate Arma's taking over Hudson's premises and a transfer of Hudson's assets (including the Standard Equipment) to Arma for the purpose of frustrating and interfering with the contractual relationship between Standard and Hudson under the Settlement Agreement. In that regard,

Standard asserts that Arma is obligated to pay to Standard the balance due by Hudson under the Settlement Agreement in respect to the 1984 action by Standard against Hudson, and punitive damages.

There is no evidence that Hudson's debt defaults, termination of business operations and peaceful surrender of the Newburgh premises and machinery to Newburgh Corp. was made in pursuance of a scheme or conspiracy between Hudson and Arma to defraud Standard or frustrate the Settlement Agreement. Hudson's defaults on the Settlement Agreement, mortgages and its other debts were made in the face of serious financial and operational difficulties. There is no evidence that the peaceful surrender of the assets in which Newburgh Corp. held mortgages and a security interest was made for anything other than legitimate business reasons. The record fails to show there were any arrangements or dealings between Hudson and Arma relating to Hudson's performance of its obligations to Standard under the Settlement Agreement or concerning either the peaceful surrender of the Newburgh premises and machinery or the disposition of the Standard Equipment.

—Standard's conversion theory

■ Standard claims that defendants wrongfully converted the Standard Equipment. According to Standard: the 1984 Agreement settled the issue of Standard's ownership of the Standard Equipment; after Hudson's default under the Settlement Agreement, defendants refused to return the Equipment; Arma refused to purchase the Equipment from Standard, used it in the Newburgh plant and held the Equipment hostage to phony storage charges.

Defendants vigorously deny that either of them converted the Standard Equipment inasmuch as (1) upon execution of the Settlement Agreement, title to the Standard Equipment passed to Hudson, and (2) the continued presence of the Standard Equipment on the Newburgh premises after the premises were relinquished by Hudson was without Arma's consent, constituted a trespass, and therefore Arma's use of the Equipment was privileged.

To reiterate the pertinent sequence of events leading up to Hudson's and Arma's possession and use of the Equipment:

The Standard Equipment was shipped from Standard's closed Paterson plant and installed in the Newburgh premises in 1980 when New–Stan acquired the premises from Newburgh Corp. In 1982, New–Stan terminated its business and peacefully surrendered the Newburgh premises and machinery to Newburgh Corp. However, the Standard Equipment on the premises (which had not been purchased by New–Stan) was neither returned to Standard by New–Stan nor repossessed by Standard.

In December 1982, contemporaneously with New–Stan's peaceful surrender of the Newburgh premises and machinery to Newburgh Corp., the latter sold those assets to Hudson, who then occupied the Newburgh premises and came into possession of the Standard Equipment left on the premises by New–Stan and Standard. From 1982 to 1984, the Standard Equipment remained on the Newburgh premises in possession of Hudson, subject to Standard's claims of ownership and demands for repossession.

In April 1984, Standard sued Hudson charging, *inter alia*, that Hudson had converted the Standard Equipment. On October 22, 1984 Standard and Hudson entered into contemporaneous Settlement and Security Agreements concerning the Standard Equipment. The Settlement Agreement stipulated that Standard "presently" owned the Equipment, but the contemporaneous agreements effectively transferred title and the right of possession to Hudson, subject to Standard's security interest.

In early 1985, Hudson became insolvent and defaulted under its Agreements with Standard and on its mortgages and other obligations to Newburgh Corp. Unknown to Standard at that point in time, April 1985, Hudson peacefully surrendered to Newburgh Corp. the Newburgh premises and machinery, and Newburgh Corp. contemporaneously leased the premises and sold the Newburgh machinery to Arma, who assumed Hudson's dyeing and finishing operations and the use of the Standard

Equipment in the plant. There was no agreement or arrangement among Hudson, Newburgh Corp. and Arma concerning the continued presence, removal or other disposition of the Standard Equipment on the premises or the use of any of the Standard Equipment by Arma following the peaceful surrender of the premises.

To summarize: The Standard Equipment was simply abandoned by the defunct Hudson and left on the Newburgh premises at the time of the peaceful surrender of the premises to Newburgh Corp. There was no formal transfer or conveyance of the Equipment by Hudson to Newburgh Corp. or by the latter to Arma. Thereupon, Arma leased the premises without making any objection to its lessor or to Hudson (who then owned the Equipment) concerning the continued presence of the Standard Equipment on the premises. However, shortly thereafter Massimi, in street conversations with Nazzaro, requested that that latter remove his "junk" from the premises and periodically billed Standard for storage charges (discussed *infra*). Standard ignored these requests and billings, filed the current action in July 1985, and in December 1985, obtained a final money judgment against Hudson by order to show cause before Judge Haight in compliance with the Settlement Agreement. Meanwhile, Arma made use of the Standard Equipment inside the plant. Hudson never objected to such use by Arma. Moreover, at no time after Hudson's defaults under the Settlement and Security Agreements in early 1985, nor after Standard learned that Arma had leased the Newburgh premises and was in possession of the Standard Equipment (assertedly in July 1985), did Standard demand repossession or take action, through peaceful means or judicial proceedings, to repossess the Equipment.

In the 1984 action, the ownership of the Standard Equipment was in dispute between Standard and Hudson. Obviously, the principal objectives of the 1984 Settlement Agreement were to establish that Standard then owned the Equipment, impose a financial obligation on Hudson to make compensation to Standard, provide for disposition of the Equipment by Hudson and provide Standard with a security interest. The court has carefully reviewed the Settlement and Security Agreements contemporaneously executed on October 22, 1984 and finds that title to the Standard Equipment passed from Standard to Hudson, subject to the security interest of Standard. *Cf.* U.C.C. § 2–401(3)(b)).

The Settlement Agreement stipulates: "The Standard Equipment" is "that equipment *presently* owned by the Standard companies which is *presently* in the possession of Hudson and which is the property covered by the *Security Interest granted to the Standard companies by Hudson* * * *" (emphasis added). Under the Security Agreement (dubbed as a "Chattel Mortgage"), Hudson (the debtor) explicitly granted Standard (the creditor) a security interest, and under paragraph 1b of the debtor's warranties and covenants, Hudson is designated as the owner of the collateral, subject to Standard's security interest. Moreover, the Security Agreement provides that the rights, duties and remedies of the parties are governed by the Uniform Commercial Code. The Code explicitly addresses the passing of title and reservation for security. *See* U.C.C. § 2–401(3)(b) (passing of title to goods where delivery is to be made without moving the goods). While the Settlement Agreement provided that Standard "presently owned" the Equipment, such provision settled only the dispute concerning Standard's existing ownership of the Equipment, but did not explicitly or impliedly effectuate a retention of title for security purposes under either the Settlement or Security Agreement.

In addition to title, Hudson indisputedly was granted the right to (and the obligation of) continued possession of the Standard Equipment, subject to the terms of the Settlement and Security Agreements. Hudson's abandonment of the Standard Equipment when it peacefully surrendered the Newburgh premises and Arma's subsequent use of the installed Equipment in the plant plainly violated Standard's rights under the Settlement and Security Agree-

ments, but did not constitute a conversion of Standard's property by defendants.

Under all the facts and circumstances, the court sees no merit in Standard's conversion claim against defendants.

*Defendants' counterclaim for storage charges*

■ In its answer to the amended complaint, Arma has interposed a counterclaim for storage charges predicated on the continued presence of the Standard Equipment on the Newburgh premises. Arma's counterclaim is patently without merit.

As observed above: Arma argues and the court agrees that after execution of the 1985 Settlement and Security Agreements between Standard and Hudson, Standard neither continued to own the Standard Equipment, nor after Hudson's defaults under those Agreements did Standard even demand repossession. Further, upon Hudson's termination of its operations in 1985 and peacefully relinquishing the premises to Newburgh Corp., without any agreement or arrangement with Newburgh Corp. or Arma for subsequent removal or disposition of the Standard Equipment, Hudson must be deemed to have abandoned the Standard Equipment left on the premises. Newburgh Corp. contemporaneously leased the premises to Arma without any agreement or arrangement for the subsequent removal or disposition of the Standard Equipment. Arma made no objection to its lessor or to Hudson concerning the continued presence of the Standard Equipment on the premises, and indeed Arma used the Equipment installed in the plant. Hudson made no objection to Arma's use of the Equipment.

Neither Hudson nor Arma has interposed a cross-complaint against its co-defendant, nor has Arma filed a third party action against its lessor, Newburgh Corp., raising any issues of ownership of the Standard Equipment or liability for the continued presence of the Standard Equipment on the premises. Hence, adjudication in this action of the rights and remedies of either defendant against the other arising out of the ownership or use of the Standard Equipment or the rights and remedies of Arma against its lessor, is inappropriate

and beyond the scope of this litigation. Any infringement of Arma's right of occupancy of the Newburgh premises under its leasehold by reason of the presence of the Standard Equipment is a matter that Arma should have addressed to its lessor, Newburgh Corp., and/or to its co-defendant, Hudson, who owned the Equipment and abandoned it on the premises when it peacefully surrendered the Newburgh premises.

Standard, as the holder of simply a security interest, had a right, *but not an obligation* to repossess the Equipment from the Newburgh premises. Since Hudson's default under the Settlement and Security Agreements, Standard has evinced no interest in repossessing the Equipment or otherwise asserting its security interest. Under these circumstances, it is clear that Standard has incurred no liability for storage charges arising out of the continued presence of the Standard Equipment on the Newburgh premises.

### CONCLUSION

For the foregoing reasons, Standard has failed to sustain its claims, and Arma has not established a meritorious counterclaim. Accordingly, the complaint and counterclaim are dismissed. Each party shall bear its own costs.